UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

LUZ V. GARCIA,

                         Plaintiff,

         -v-

MICHAEL S. REGAN, as Administrator of the United
States Environmental Protection Agency,

                        Defendant.

--------------------------------------------------------------------X

19-cv-8482 (LJL)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/28/2022__

LEWIS J. LIMAN, United States District Judge:

       Defendant Michael S. Regan as Administrator of the United States Environmental

Protection Agency ("Defendant" or "EPA") moves, pursuant to Federal Rule of Civil Procedure

56, for an order granting Defendant summary judgment and dismissing the complaint of Plaintiff

Luz Garcia ("Plaintiff" or "Garcia") for employment discrimination and retaliation.  Dkt. No. 49.

       For the following reasons, the motion for summary judgment is GRANTED.

## BACKGROUND

       The following facts are undisputed for purposes of summary judgment except where

otherwise indicated.

## I.    The 2017 Vacancy

       Garcia is an employee of EPA, where she has been employed since 1989.  Dkt. No. 51,

Defendant's Rule 56.1 Statement ("Def. Statement") ¶ 1.[1]  She is Hispanic and speaks with an

---

[1] The document filed at Dkt. No. 51 contains the parties' joint statement of facts pursuant to
Local Rule 56.1 ("Joint Rule 56.1 Statement"), as well as Defendant's statement of additional
facts pursuant to Local Rule 56.1 ("Defendant's Rule 56.1 Statement"), with independent
numbering for each statement.  For ease of reference, citations to Dkt. No. 51 will be to the Joint
Rule 56.1 Statement or the Defendant's Rule 56.1 Statement, whichever the case may.

accent.  *See* Dkt. No. 52-18 at 3; Dkt. No. 52-8 at 53; Dkt. No. 52-11 at 11.  Regan is the Administrator of the EPA and constitutes the "head of the department, agency or unit" subject to suit on behalf of the agency pursuant to 42 U.S.C. § 2000e-16(c).

In October of 2017, EPA announced a vacancy, RTP-R2-MP-2017-0041 (the "2017 Vacancy"), for the position of Life Scientist/Environmental Engineer/Physical Scientist (Remedial Project Manager) ("RPM") within the Emergency and Remedial Response Division, New Jersey Remedial Branch, New Jersey Projects/State Coordination Section.  Joint Rule 56.1 Statement ("Joint Statement") ¶ 1.  The posting for the RPM position was open from October 11, 2017 to October 24, 2017.  Dkt. No. 52-1.  To be eligible to apply, individuals had to be then-current permanent Region 2 EPA employees with competitive status or eligible for the EPA Career Transition Assistance Program.  *Id.*  The job announcement explained that the job duties would involve determining appropriate cleanup actions, methods, and tools for toxic and hazardous waste sites; directing contractual work efforts in cases where EPA must assume the cleanup duties to assure that federal funds are properly expended and that contractors are utilized effectively and efficiently; serving as a senior resource for complex site situations that involve toxic and hazardous waste cleanup; participating in, leading or monitoring activities; and performing community relations activities within a public forum as a representative of the agency.  *Id.*  The posting stated that the required qualifications for the job included a bachelor's degree from an accredited or pre-accredited college or university in certain listed subjects.  *Id.*  It also stated that EPA was looking for at least one year of specialized experience relating to the position.  *Id.*

Under EPA procedures, after a vacancy is posted, the EPA's Human Resources ("HR") group at Research Triangle Park ("RTP") screens applications and determines which candidates

are eligible to be interviewed.  Joint Statement ¶ 18.  Applicants are eligible for either "non-competitive" or "competitive" consideration.  Def. Statement ¶ 6.  To be eligible for non-competitive consideration, a candidate needed to satisfy the basic eligibility requirements and have previously worked in a position at the same grade or with promotion potential to the same grade as the RPM position—namely, the grade of GS-13.  *Id.*  To be eligible for competitive consideration, a candidate's application needed to receive a minimum score from a software program that scores all applications.  *Id.*

Plaintiff applied for the RPM position posted in the 2017 Vacancy, and HR sent a list of candidates who were deemed qualified for the position to Jeff Josephson, the Chief of the New Jersey Projects State Coordination Section.  Joint Statement ¶ 15; *see also* Dkt. No. 52-25 ¶ 1.  In connection with the 2017 Vacancy, Josephson was the subject matter expert and selecting official and was involved in the interview process.  *See* Dkt. No 52-8 at 32; Joint Statement ¶ 14.  Four candidates were on the list sent by HR to Josephson:  Plaintiff and a person named Sadira Robles were included on a competitive certificate, while Carol Stein and Stephanie Wilson were included on a non-competitive certificate.  Joint Statement ¶ 17.

A three-member panel interviewed each of the four applicants.  *Id.* ¶ 19.  In addition to Josephson, the panel was comprised of Angela Carpenter, Chief of the Special Projects Branch in the Superfund and Emergency Management Division, and Pietro Mannino, a Section Chief in the Superfund and Emergency Management Division.  *Id.*; *see also* Dkt. No. 57-9 at 6; Dkt. No. 57-10 at 6.  Members of the panel did not independently screen the applicants to determine which candidates were eligible to be interviewed but did receive the candidates' application packets, including their resumes.  Def. Statement ¶ 4; *see also* Dkt. No. 52-11 at 12; Dkt. No. 52-10 at 21.

Plaintiff's application reflected her lengthy resume.  Plaintiff has been employed by the EPA since 1989.  Dkt. No. 52-3 at 9.  She has held several positions at the EPA, including Environmental Scientist, Physical Scientist, Emergency Response Team member (RCRA Expert), Hispanic Employment Program Manager, and Special Assistant to the Deputy Regional Administrator, and, since 2012, Environmental Protection Specialist.  *Id.* at 1–10.  Before working at the EPA, she was employed by Bristol-Myers Squibb Pharmaceutical Inc., from 1986 to 1988; by the United States Navy, from 1984 to 1986; and for the Environmental Quality Board, from 1981 to 1984, where she supervised a team of sixteen scientists and engineers.  *Id.* at 10–13.  Plaintiff received her bachelor's degree in 1979 from the University of Puerto Rico, where she majored in Chemistry and minored in Biology; a master's degree in Environmental Engineering *manga cum laude* from Polytechnic University, in 1998; and, in 2000, a second master's degree in Environmental Education from New York University, also *magna cum laude*. *Id.* at 13–14; *see also* Joint Statement ¶ 10.  She has certifications for Contracting Officers, Project Officers, and Grant Officers, as well as training in GIS Mapping, Groundwater Investigation, Asbestos Sampling, the Incident Command System, Ethics Training for Acquisition Tech. and Logistics, and Earned Value Management.  Joint Statement ¶ 10.

The other applicants also had strong backgrounds.  Stephanie Wilson's application reflected that she began working at the EPA in August 2015 as a Life Scientist.  Dkt. No. 52-4 at 1.  Before that, from April 2015 until August 2015, she worked as a Research Associate at the Great Basin Institute and the Bureau of Land Management.  *Id.* at 3.  From March 2014 until September 2014, she worked as a Conservation and Land Management Intern at the Chicago Botanic Garden and the Bureau of Land Management.  *Id.*  She also served as a Research Technician at the University of California, Davis, from June 2013 until August 2013; as the John

J. Willaman & Martha Haas Valentine Endowed Plant Protection Intern at the Morris Arboretum of the University of Pennsylvania, from June 2012 until June 2013; and as a Research Technician at the College of William and Mary, from August 2011 until June 2012. *Id.* at 4–5. She received a bachelor's degree in Biology *summa cum laude* from the College of William and Mary in 2012, and an Occupational Certificate in GIS/Spatial Analysis from the University of Pennsylvania in June 2013. *Id.* at 7–8. In 2009, she co-wrote a peer-reviewed paper that was used to recommend policy changes in Virginia. *Id.* at 7. At the time of the application, Wilson served as the regional Special Emphasis Program Manager for Women in Science and Engineering. *Id.* at 10. And she had completed various trainings, including regarding the Resource Conservation and Recovery Act ("RCRA"), National Pollutant Discharge Elimination System enforcement, and conservation and land management. *Id.* at 8.

Sadira Robles's application reflected that she has worked for EPA since 2010.[2] She was an Environmental Scientist from May 2010 to September 2010, a Grants Project Manager from September 2010 to September 2011, a Project Manager within the EPA's Clean Air Sustainability Division from September 2011 to September 2012, and a Corrective Action Project Manager in the Clean Air Sustainability Division from September 2012 until the time of her application. Dkt. No. 52-7 at 2–4. She had also worked as a Remedial Project Manager from October 2007 to April 2010 for Environmental Strategies and Applications Inc. and from January 2007 to October 2007 as a Project Manager for the Hudson County Economic Development Corporation. *Id.* at 4–5. Robles received a bachelor's degree in Environmental Science from

---

[2] The Joint Rule 56.1 Statement suggests that Robles had worked at EPA since October 2007. *See* Joint Statement ¶ 13. However, her application materials indicate that, from October 2007 to April 2010, she worked for an "Environmental Strategies and Applications Inc." Dkt. No. 52-7 at 4–5.

New Jersey City University in 2007, a graduate certification in project management in May 2010, and a master's degree in Management, with a major in Project Management from Stevens Institute of Technology in 2012.  *Id.* at 6.  She has the following certifications: CERCLA[3] Superfund 101 Certification, Contractor Officer Representative Certification, 40-Hour Hazardous Waste Operations and Emergency Response Training Case Development Training, and Emergency Management Institute Training.  *Id.*; *see also* Joint Statement ¶ 13.

At the time of her application, Carol Stein had been employed as an Environmental Engineer at EPA since June 1980 in various divisions, including the Emergency and Remediation Response Division and the Clean Air and Sustainability Division.  Dkt. No. 52-6 at 1–2.  She also temporarily served as the Acting Chief of the New York Section for the RCRA Programs Branch.  *See id.* at 3.  Stein has a bachelor's degree from Rutgers University in Agricultural Engineering and Environmental Studies and a master's degree in Business Administration from Baruch College of the City University of New York.  Def. Statement ¶ 2. She had certifications as a Professional Engineer in the State of New York and Contract Officer Representative.  Dkt. No. 52-6 at 8.

The three-person panel interviewed these candidates and asked each candidate the same set of questions.  Joint Statement ¶ 19; Def. Statement ¶ 7.  The interviewers worked under the assumption that the candidates they were interviewing had been deemed technically eligible for the job and that their job was to identify which of the eligible candidates would be the best person for the job.  Def. Statement ¶ 5. At the end of the interview process, the interviewers had "discussions on who [they] believed . . . provided the best interview" and was most qualified for

---

[3] "CERCLA" refers to the Comprehensive Environmental Response, Compensation, and Liability Act.

the position, Joint Statement ¶ 21 (quoting Dkt. No. 52-8 at 41); the discussion lasted approximately fifteen minutes, Dkt. No. 52-8 at 50.  The interviewers "did not discuss anything other than the questions that they answered to and their resumes."  Def. Statement ¶ 13 (quoting Dkt. No. 52-11 at 37).  They also did not assign scores to the candidates or rank them.  Joint Statement ¶ 23.  After the discussion, the interviewers came to "a unanimous decision . . . that [Wilson] provided the best interview."  *Id.* ¶ 21 (quoting Dkt. No. 52-8 at 41).  The interviewers also unanimously concluded that Wilson was the best candidate for the job, based on the strength of her interview performance.  *Id.* ¶ 22.

Josephson testified that, during the interviews of the four candidates, he assessed "how the [candidates] address[ed] each question and how specifically they can provide information that allows me to evaluate their experience level."  Def. Statement ¶ 8 (quoting Dkt. No. 57-8 at 34).  He looked for "a certain amount of enthusiasm for the job," *id.* (quoting Dkt. No. 57-8 at 34), and assessed whether candidates "provide[d] specific examples based on the question that demonstrates [their] ability to perform that task or having accomplished the task in any way," *id.* (quoting Dkt. No. 57-8 at 36).   Josephson concluded that "Wilson demonstrated through her interview that she had the skills that we were looking for or I was looking for as a remedial project manager."  *Id.* ¶ 9 (quoting Dkt. No. 52-8 at 49).  He testified that Wilson showed "that she had skills with data management and with ER programming language and with GIS capability, which are all computer systems that can handle large data sets," and she demonstrated an "ability to interact with a large number of groups, such as our headquarters and possibly research and development at EPA, different offices within the EPA," and to coordinate with those groups to achieve her tasks.  *Id.* (quoting Dkt. No. 52-8 at 60–61).  By contrast, Plaintiff did not provide information regarding her data management or mathematical modeling abilities.

*Id.*  And in response to a question regarding experience dealing with contaminated sediment sites, mathematical modeling, and radiation, Plaintiff addressed "the radiation component of the question" but was "silent" as to whether she had any experience with mathematical modeling and contaminated sediment sites.  *Id.* ¶ 10 (quoting Dkt. No. 52-10 at 27–28).  In response to the same question, Wilson "talked about contaminated sites with corrective action," as well as "mathematical modeling," and "gave examples of the mathematical modeling work that she did, and then she also . . . tied in her skills . . . with Excel and how they're used to inform decision-making."  Def. Statement ¶ 10 (quoting Dkt. No. 52-10 at 28).

Mannino believed that Wilson more effectively explained to the interview panel how she would apply her skillset to the job.  Mannino identified multiple questions to which Wilson gave more detailed responses than did Plaintiff.  For example, in responding to one of the interview questions, Wilson "touche[d] upon the complexity of the example that she provide[d], [and] talk[ed] about the group dynamics and the personalities in her response, competing interests, and how she worked through the difficult issues to move the project forward."  *Id.* ¶ 11 (quoting Dkt. No. 52-10 at 47–48).  By contrast, Plaintiff's answer did not identify any "complexity" and did not touch on as many of the components of the question.  *Id.* (quoting Dkt. No. 52-10 at 48); *see also* Dkt. No. 52-10 at 48.  On another question, which asked candidates to describe their experience producing written documents, Wilson discussed "a greater number of documents" and "provide[d] an explanation on what . . . at least some of those documents relate to."  Def. Statement ¶ 11 (quoting Dkt. No. 52-10 at 49).  On yet another question, which addressed how candidates involve colleagues when important decisions need to be made, Plaintiff identified a single item that was responsive to the question, while Wilson "identifie[d] three or four actions" that were responsive.  *Id.* (quoting Dkt. No. 52-10 at 49).

Carpenter believed that, although none of Plaintiff's responses made her "undesirable" for the RPM position, "there were a couple of questions where [Carpenter] felt [Plaintiff] didn't answer the question in a manner that indicated she was providing a response that was suitable to the question." *Id.* ¶ 12 (quoting Dkt. No. 52-11 at 18). Carpenter testified that Wilson, in contrast to Plaintiff, generally "provided detailed answers," and "showed a thorough understanding of the questions and provided relevant responses." *Id.* (quoting Dkt. No. 52-11 at 20). Carpenter continued: "She was able to show how her experiences could weave together for project management purposes. She gave good examples, for example, her skills in networking and how she used those skills to network both internally and externally to the region to complete a project." *Id.* (quoting Dkt. No. 52-11 at 21). Carpenter explained that she believed that the skills that Wilson described in detail were "very beneficial to the remedial project manager position." *Id.* (quoting Dkt. No. 52-11 at 21).

During the debrief meeting after the interviews, the interviewers did not discuss anything other than the questions the candidates answered and the candidates' resumes. *Id.* ¶ 13; *see also* Dkt. No. 52-11. The interviewers each testified that Plaintiff's national origin did not affect their decision not to select Plaintiff as the successful candidate. Def. Statement ¶ 14; *see also* Dkt. No. 57-9 at 44; Dkt. No. 52-8 at 75; Dkt. No. 57-10 at 55. At the conclusion of the process, Josephson selected Wilson for the 2017 Vacancy. Def. Statement ¶ 15.

## II.    The Rescission of the Offer for the 2017 Vacancy

RTP conducts regular quality assurance audits related to EPA hiring. Def. Statement ¶ 16. In March 2018, after Josephson had selected Wilson for the RPM position, one such audit revealed that Wilson had been included in the list of applicants deemed eligible for the position by mistake. *Id.*; *see also* Joint Statement ¶ 24. She was not eligible to be included on the non-competitive certificate of eligible candidates for the 2017 Vacancy, because that list was limited

to employees who had previously worked in a position at, or with promotion potential to, the GS-13 level, and Wilson's position did not qualify as such.  Def. Statement ¶ 16; *see also* Dkt. No. 52-12 ¶ 5.  She also would not have been eligible to be selected on a competitive certificate because, as a general matter, applicants must achieve a score of 90 or higher by the software program used in order to be included on a competitive certificate, and Wilson had received a score of 86.49.  Def. Statement ¶ 16; Dkt. No. 52-12 ¶¶ 6–7.

As a result of the audit findings, EPA rescinded Wilson's offer and cancelled her assignment to the 2017 Vacancy, though by that time, she had already begun working in that position.  Joint Statement ¶ 25.  A memorandum was prepared by a HR specialist at RTP that Wilson was erroneously qualified for the position and that no further selections were made from the announcement.  *Id.* ¶ 24.  RTP staff notified EPA personnel in Region 2—the region where the RPM position was located—that, if the office wished to refill the position, they would have to post a new vacancy announcement.  *Id.* ¶ 25.  They also notified the office that Wilson could be assigned to a temporary work assignment offered for periods of 120 days.  Dkt. No. 52-15 ¶ 6.  As a result, Wilson was assigned to such temporary work assignments that enabled her to continue work in the same office, under Josephson's supervision.  Joint Statement ¶ 25.

## III.   The 2018 Vacancy

In 2018, EPA posted Vacancy Announcement Number RTP-R2-MP-2018-0039 (the "2018 Vacancy") for the position of Life Scientist/Environmental Engineer/Physical Scientist (Remedial Project Manager) with an open period from April 3, 2018 to April 4, 2018.  Joint Statement ¶ 5.  Four candidates were deemed qualified by RTP in connection with the 2018 Vacancy.  *Id.* ¶ 26.  Three of the candidates were identical to those on the 2017 certificate: Plaintiff, Wilson, and Robles.  *Id.*  By that time, Wilson's application received a score of 98.83, which was sufficiently high for her to be placed on the competitive certificate of eligible

candidates.  *Id.* ¶ 27.  The fourth applicant, Julio Vazquez, was listed on a non-competitive certificate.  *Id.*

The selecting official for the 2018 Vacancy was Kimberly O'Connell, who had only recently been promoted to be the branch chief.  *Id.* ¶ 28.  O'Connell did not personally review the applications.  *Id.*  Instead, she deferred to Josephson, who had explained the history of Wilson's earlier selection and who informed her that that the 2017 position essentially was "re-announced," Def. Statement ¶ 17, and that he wanted to select Wilson for the 2018 Vacancy, Joint Statement ¶ 28.  O'Connell acceded to Josephson; she trusted Josephson's judgment and believed it was important that the section chief (who was Josephson) should select the person who would report directly to him.  *Id.*

## IV.    Plaintiff's Prior Complaints of Discrimination

Plaintiff has made three prior complaints about discrimination at EPA.  *Id.* ¶ 40.  In or around 2001, Plaintiff filed a complaint with EPA's Office of Civil Rights ("OCR") alleging that she was discriminated against when she was not selected for promotion to a GS-13 position, and the person selected for the position was white and allegedly had less experience than she did.  *Id.* ¶ 41.  Plaintiff's 2001 complaint resulted in a settlement agreement, pursuant to which Plaintiff took two years of leave without pay.  *Id.* ¶ 42.  After she returned from leave, she was relocated so that she would not be working under the same EPA manager, John Gorman, who she alleged had discriminated against her.  *Id.*

Plaintiff filed a second discrimination complaint with EPA's OCR in or around 2011.  *Id.* ¶ 43.  The alleged discrimination was based on Gorman's becoming the EPA branch chief of the office where Plaintiff was working, allegedly in violation of the settlement of her 2001 discrimination complaint.  *Id.*

Plaintiff's third complaint with EPA's OCR was filed on October 23, 2015. *Id.* ¶ 44. In it, she alleged that EPA retaliated against her based on her prior discrimination complaints. *Id.* Plaintiff alleged that an EPA employee from HR required she to attend a meeting without a representative of her choice and requested that she sign a form related to complaints made against Plaintiff by one of her coworkers. *Id.* She later amended her October 2015 complaint to allege that her removal from EPA in January 2016—discussed below—was discriminatory. *Id.* ¶ 45.

**V.   Plaintiff's Prior Termination, Appeal, and Reinstatement**

Effective January 25, 2016, Plaintiff was removed from her employment at EPA based on a finding by EPA that she had engaged in inappropriate conduct. Def. Statement ¶ 20. In particular, one of Plaintiff's co-workers alleged that Plaintiff told her that she had a "fat, wrinkled neck" in a profile photograph, and a second coworker alleged that Plaintiff told her that her profile photograph was ugly and should be taken down. *Id.* The decision was also informed by the fact that Plaintiff had a record of multiple disciplinary actions and had been given notice that such unprofessional conduct was inappropriate and might subject her to discipline. *Id.*

Plaintiff immediately appealed her removal to the Merit System Protection Board ("MSPB"), which reversed EPA's action in removing Plaintiff on the basis that EPA had not proven by a preponderance of the evidence that she engaged in inappropriate conduct. Joint Statement ¶¶ 46–47. The MSPB concluded that the testimony of Plaintiff's co-workers, to whom she had allegedly directed her inappropriate statements, was not credible. *Id.* ¶ 47. In her MSPB appeal, Garcia raised an affirmative defense of discrimination based on national origin. *Id.* ¶ 48. As to this affirmative defense, the MSPB concluded that Plaintiff failed to show it by a preponderance of the evidence, including because she failed to submit evidence that similarly situated employees were treated differently than she was treated. *Id.* ¶ 49. At the time EPA

made the decision to remove Plaintiff, she already had four prior disciplinary actions on her

record.  *Id.*  Plaintiff failed to provide evidence of similarly situated employees who had a prior

disciplinary record and were treated better or more leniently than she was treated.  *Id.*  The

MSPB also concluded that the EPA personnel responsible for Plaintiff's removal testified

credibly that their decision was not related to national origin discrimination.  *Id.*  Following

MSPB's determination, Plaintiff was reinstated to a position at EPA.  *Id.* ¶ 50.

## PROCEDURAL HISTORY

Plaintiff initiated internal administrative procedures regarding the failure to appoint her to

the 2018 Vacancy on October 17, 2018 by contacting an Equal Employment Opportunity

("EEO") counselor to request an initial counseling decision.  Joint Statement ¶ 31; Dkt. No. 2

¶ 46.  On November 27, 2018, Plaintiff filed a discrimination complaint with the EPA OCR

alleging employment discrimination and retaliation in the failure to appoint her to the 2018

Vacancy.  Joint Statement ¶ 32.  After more than 180 days had elapsed after the filing of her

OCR complaint, Plaintiff filed her complaint in this Court alleging employment discrimination

and retaliation on September 12, 2019.  Dkt. No. 2.  On July 9, 2021, Defendant moved for

summary judgment.  Dkt. No. 49.  Plaintiff filed her memorandum of law in opposition to the

motion on August 13, 2021.  Dkt. No. 47.  On August 27, 2021, Defendant filed a reply

memorandum of law in further support of its motion.  Dkt. No. 61.

## LEGAL STANDARDS

### I.   Summary Judgment

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these

purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue

of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

Thus, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party thus cannot "rely on conclusory allegations or unsubstantiated speculation," *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)), or "defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).[4] That

---

[4] The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All

is, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"In evaluating whether the parties have met their respective burdens, this Court 'examine[s] the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer.'" *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 254 (S.D.N.Y. 2009) (alteration in original) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001)).

The Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). However, because its "salutary purposes" apply with equal force in the employment context, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), summary judgment "remains available . . . in cases lacking genuine issues of material fact." *Agostinello v. Great Neck Union Free Sch. Dist.*, 353 F. App'x 589, 590 (2d Cir. 2009) (summary order) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994)). Indeed, the Supreme Court has instructed that courts are not to treat discrimination any "differently from other ultimate questions of fact." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

---

statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c). Plaintiff here failed to respond to the statements in Defendant's Rule 56.1 statement. Accordingly, those statements are deemed admitted for purposes of this motion.

## II.     Employment Discrimination

Claims of adverse employment discrimination under Title VII are governed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this standard, Plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position he held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.  *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).  "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the termination.  If defendant does so, the burden returns to the plaintiff to show that the real reason for [the adverse action] was his [protected status]."  *Id.* at 492.

## DISCUSSION

Plaintiff asserts claims for employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.[5]  Defendant moves for summary judgment on all claims.

---

[5] Plaintiff's complaint also curiously invokes the Government Employee Rights Act ("GERA"), 42 U.S.C. § 2000e-16. Dkt. No. 2 ¶ 1.  GERA applies to: "[A]ny individual chosen or appointed, by a person elected to public office in any State or political subdivision of any State by the qualified voters thereof— (1) to be a member of the elected official's personal staff; (2) to serve the elected official on the policymaking level; or (3) to serve the elected official as an immediate advisor with respect to the exercise of the constitutional or legal powers of the office."  42 U.S.C. § 2000e-16c(a)(1)–(3).  Employees to whom GERA is applicable must file discrimination claims first with the Equal Employment Opportunity Commission ("EEOC"), which determines whether a violation has occurred and issues an opinion through a final order.  *Id.* § 2000e-16c(b)(1).  A party aggrieved by the final order of the EEOC may seek judicial review in the United States Court of Appeals.  *See Fischer v. New York State Dep't of L.*, 2014 WL 12674462, at *1 (S.D.N.Y. June 20, 2014) (citing 42 U.S.C. § 2000e-16c(c)).  "[D]istrict courts lack jurisdiction to hear claims covered by GERA."  *Id.* (citing cases).  Defendant notes that Plaintiff does not allege that GERA applies to her; Plaintiff does not respond to that argument and thereby abandons it.  *See, e.g.*, *Shenk v. Karmazin*, 868 F. Supp. 2d 299, 311 n.12 (S.D.N.Y. 2012) ("While [the plaintiff] originally alleged in his complaint that the defendants breached their fiduciary duties . . . , he has not responded to defendant's arguments on summary judgment.  Accordingly, he has conceded that defendants are entitled to summary judgment on

The Court first turns to Plaintiff's claims for employment discrimination.  It then addresses her claim for retaliation.

## I.  Plaintiff's Claims for Employment Discrimination

Plaintiff alleges that she was discriminated against on the basis of her national origin in the EPA's failure to appoint her to the 2017 Vacancy or the 2018 Vacancy.  Her claim with respect to the 2017 Vacancy is time-barred as a result of her failure to timely exhaust administrative remedies.  Even if it were not time barred, Defendant is entitled to summary judgment both on that claim and on the claim relating to the failure to appoint her to the 2018 Vacancy.  Although Plaintiff has established evidence to support a *prima facie* case of discrimination, Defendant has offered a legitimate nondiscriminatory reason for the decision to select Wilson over her and Plaintiff has offered no evidence from which a reasonable jury could determine that such reason was pretextual.

### A.  Plaintiff's Claim Based on the 2017 Vacancy is Time-Barred

"Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court." *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 384 (2d Cir. 2015).  "Timely exhaustion of administrative remedies requires that a federal employee comply with applicable EEOC regulations." *Lucenti v. Potter*, 432 F. Supp. 2d 347, 356 (S.D.N.Y. 2006); *see Briones v. Runyon*, 101 F.3d 287, 289 (2d Cir. 1996) (same); *Bamba v. U.S. Dep't of Homeland Sec.-FPS*,

---

this claim for breach." (citing *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.")); *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (deeming claims alleged in the complaint abandoned where "Defendants' summary judgment motion specifically addressed all of these claims," but the plaintiff's "opposition papers, however, addressed none of these claims," and collecting cases where other courts have similarly deemed claims abandoned for failure to defend them in opposition to summary judgment).  Accordingly, to the extent that Complaint can be read to assert a claim under GERA, Defendant is entitled to judgment on that claim as well.

2021 WL 4478677, at *3 (S.D.N.Y. Sept. 30, 2021) (same); *Avillan v. Donahoe*, 2015 WL 728169, at *9 (S.D.N.Y. Feb. 19, 2015) (same).  Under those regulations, a federal employee who believes that she has been the victim of race or national origin discrimination must contact an EEO counselor to request an initial counseling session "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).  Within thirty days of the request for such a session, the counselor must conduct a "final interview."  *Id.* § 1614.105(d).  If the dispute remains unresolved, the counselor then informs the employee in writing of her right to file a formal discrimination complaint with the agency.  *Id.*  Such a complaint must be filed within fifteen days of the receipt of the written notice.  *Id.*  "Courts must strictly adhere to such procedural requirements for gaining access to the federal courts."  *Lucenti*, 432 F. Supp. 2d at 357.  Where a plaintiff fails to timely exhaust her administrative remedies, her claims may be time-barred.  *See id.* at 357–58.

The Second Circuit has not spoken clearly to the date from which the 45-day period runs in the case of a failure to promote.  The regulation appears to refer to two different dates: "the date of the matter alleged to be discriminatory" and the "effective date of the action" in the case of personnel action.  *See Bamba*, 2021 WL 4478677, at *8–9 (discussing cases and holding that "effective date" is not necessarily the date of the matter alleged to be discriminatory) (citing 29 C.F.R. § 1614.105(a)).  The difference is immaterial in this case.  The date appears to be the same and, regardless, Plaintiff's claim based on the failure to appoint her to the 2017 Vacancy is time-barred.

The record contains a Notification of Personnel Action dated January 21, 2018 reflecting the appointment of Wilson to the position of Physical Scientist (RPM) at GS-level 13.  Dkt. No.

57-7.  It also is undisputed that Plaintiff learned no later than May 2018 that Wilson was selected

for the 2017 Vacancy.  Joint Statement ¶ 29.  Garcia did not contact EPA's OCR to request an

initial counseling session until October 17, 2018—more than forty-five days after May 2018—

and even then, she did so only with respect to her non-selection for the 2018 Vacancy.  *Id.* ¶ 31;

*see also* Dkt. No. 2 ¶ 46 (alleging that Plaintiff contacted EEO counselor regarding promotions

for the 2018 Vacancy).  Accordingly, her claim is untimely and defendant is entitled to summary

judgment.  *Avillan*, 2015 WL 728169, at *10.

Plaintiff does not dispute that she failed to contact the EEO Counselor within forty-five

days of learning that the 2017 Vacancy had been filled and that she had not been selected.  She

admitted at deposition that she did not file a complaint for that position.  Dkt. No. 52-19 at 66.

She relies instead on the "continuing violations" exception to the administrative exhaustion

requirement.

Under the continuing violations doctrine, a series of discrete acts can under certain

circumstances be considered to constitute a single "unlawful employment practice," for purposes

of administrative exhaustion.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–11

(2002).  Since the Supreme Court's decision in *Morgan*, the continuing violation doctrine has

been limited to "claims amounting to assertions of hostile-work environment or similar claims

that 'cannot be said to occur on any particular day' but rather are the product of events that take

place 'over a series of days or perhaps years.'" *Mohamed v. New York Univ.*, 2015 WL 3387218,

at *15 (S.D.N.Y. May 21, 2015) (quoting *Morgan*, 536 U.S. at 115), *report and recommendation*

*adopted*, 2015 WL 5307391 (S.D.N.Y. Sept. 10, 2015).  The doctrine does not operate to revive

claims with respect to time-lapsed discrete discriminatory acts.  "[D]iscrete discriminatory acts

are not actionable if time barred, even when they are related to acts alleged in timely filed

charges." *Morgan*, 536 U.S. at 113; *see Hausdorf v. N.Y.C. Dep't of Educ.*, 2018 WL 1871945, at *5 (S.D.N.Y. Jan. 25, 2018) (holding that allegations that plaintiff was denied certain promotions and received unsatisfactory performance reviews and disciplinary letters were "discrete events that were separate from the incidents occurring during the limitations period" and thus were time barred), *report and recommendation adopted*, 2018 WL 895657 (S.D.N.Y. Feb. 14, 2018).  Thus, "[f]ailure to promote, refusal to rehire, termination, job reassignments, and unsatisfactory performance reviews are discrete acts that constitute separate actionable employment practices." *Hausdorf*, 2018 WL 1871945, at *5 (citing *Morgan*, 536 U.S. at 114); *see, e.g.*, *Roache v. Long Island R.R.*, 487 F. Supp. 3d 154, 169 (E.D.N.Y. 2020); *Sirisena v. City Univ. of New York*, 2019 WL 1493220, at *4 (E.D.N.Y. Mar. 31 2019); *Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 500 (S.D.N.Y. 2010).  Out-of-time claims may still "provide 'relevant background evidence'" to any timely claims.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (quoting *Morgan*, 536 U.S. at 112).

Defendant's conduct with respect to the 2017 Vacancy and 2018 Vacancy were discrete actions.  Plaintiff's request for conciliation with respect to the 2018 Vacancy does not revive her stale claim with respect to the 2017 Vacancy.[6]  By January 2018, Defendant's conduct with respect to the 2017 Vacancy was complete.  Wilson had been chosen and Plaintiff had not.  Although Wilson's appointment later had to be cancelled, Dkt. No. 52-12 ¶¶ 8–9; Dkt. No. 52-14, the selections for the 2017 Vacancy were complete, Dkt. No. 52-14.  Had Plaintiff believed that Defendant acted with discriminatory intent in failing to select her, she was required to make

---

[6] The "continuing violations" theory addresses the statutory time period for filing charges with the Equal Employment Opportunity Commission under 42 U.S.C. § 2000e-5(e)(1), which runs from the date of "the alleged unlawful employment practice."  The Court assumes, without deciding, that the same doctrine also would apply to the time periods under 29 C.F.R. § 1614.105.

the administrative request for conciliation after Wilson was appointed to the 2017 Vacancy.  The selection process for the 2018 Vacancy was a separate, discrete act.  It required a new posting which elicited applications from a new and only partially overlapping group of applicants, who were reviewed by a new selecting official.  Although that selecting official, O'Connell, chose to follow the recommendation of the selecting official for the 2017 Vacancy, there was no requirement that she do so.  Each decision thus constitutes a separate alleged discriminatory act or personnel decision, and each required a separate complaint to the EEO Officer.

### B. Plaintiff's Claims of National Origin Discrimination with Respect to the 2017 Vacancy and 2018 Vacancy Fail to Identify a Genuine Issue of Fact

Even if Plaintiff's claim with respect to the 2017 Vacancy were not time-barred, she has not identified a genuine issue of fact requiring trial with respect either to that vacancy or to the 2018 Vacancy.

The parties do not dispute for purposes of summary judgment either that Plaintiff has satisfied her initial burden under the *McDonnell Douglas* framework and established a *prima facie* case of discrimination on the basis of national origin or that Defendant has satisfied its burden to show a legitimate non-discriminatory reason for the employment decision.  As to Plaintiff's initial burden, Plaintiff has demonstrated evidence that she (1) is Hispanic and thus a member of a protected group; (2) applied for and was qualified for the position set forth in the vacancies; (3) was rejected for the position; and (4) was denied the promotion in favor of Wilson, a white woman.  Those facts are sufficient to satisfy Plaintiff's minimal burden at the summary judgment stage.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (explaining that in employment discrimination cases, the burden of establishing a prima facie case is "minimal"); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

21

Defendant relies on the subjective judgment reached by all three members of the interview panel for the 2017 Vacancy that Wilson was the best candidate for the job, based on the strength of her interview performance, Joint Statement ¶ 22, and on O'Connell's trust in Josephson's judgment and the belief that Josephson should have the right to select the person who would be reporting to him in filling the position announced by the 2018 Vacancy, *id.* ¶ 28. Those are legitimate, non-discriminatory reasons for preferring one candidate to another. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) ("Cromwell, in turn, articulated a legitimate business reason for not hiring Byrnie: Mancarella performed better than Byrnie during the candidate interviews and thus seemed, based on subjective criteria, the better qualified candidate."). Defendant is thus entitled to summary judgment unless Plaintiff can identify facts from which a jury could determine that Defendant's proffered reasons for selecting Wilson over Plaintiff were pretextual and that discrimination played at least a part in the decision not to promote Plaintiff.

There are well-settled standards in the Second Circuit by which a court evaluates whether the purported subjective judgment of qualification or interview performance is, in fact, disguised discrimination. Were it enough for an employer to simply assert that it favored candidate A, who is not a member of a protected group, over candidate B, who is a member of a protected group, many cases of latent discrimination would go undetected and unpunished. An employer charged with discrimination would simply respond "with a claim of some subjective preference or prerogative." *Byrnie*, 243 F.3d at 104–05 (quoting *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1040 (2d Cir. 1979)). Accordingly, "an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion." *Id.* at 104 (quoting *Knight v. Nassau County Civil Serv. Comm'n*, 649 F.2d 157, 161 (2d Cir. 1981)). The

"'employer's explanation of its reasons must be clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.'" *Id.* at 105 (quoting *Meiri v. Dacon*, 759 F.2d 989, 996–97 (2d Cir. 1985)). They "must also be honest." *Id.* The employee may create a fact issue as to the honesty of the proffered reasons on the basis of her alleged superior job qualification, but to do so, she must show that her credentials were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the [plaintiff] for the job in question," *Abraham v. New York City Dept. of Educ.*, 398 F. App'x 633, 635 (2d Cir. 2010) (summary order) (quoting *Byrnie*, 243 F.3d at 103); *see also Turner v. NYU Hosps. Ctr.*, 470 F. App'x 20, 24 (2d Cir. 2012) (summary order) (same); *Peddy v. L'Oreal USA, Inc.*, 848 F. App'x 25, 26 (2d Cir. 2021) (summary order) (same), or that the defendant "disregard[ed] or misjudge[ed] . . . plaintiff's job qualifications," *Byrnie*, 243 F.3d at 103. In the absence of such proof, "the business judgment rule protects the sincere employer against second-guessing of the reasonableness of its judgments." *Id.* at 105 (quoting *Chapman v. Al Transp.*, 229 F.3d 1012, 1048 (11th Cir. 2000) (Birch, J., concurring in part and dissenting in part)); *see also id.* at 103 ("[T]he court must respect the employer's unfettered discretion to choose among qualified candidates." (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996))).

The summary judgment record contains undisputed evidence of clear and specific reasons why members of the interview panel for the 2017 Vacancy preferred Wilson over Plaintiff and, in turn, why O'Connell preferred Wilson over any of the other applicants for the 2018 Vacancy.[7]

---

[7] The Court notes that there is no evidence that the inclusion of Wilson in the pool of applicants for the 2017 Vacancy was the product of discrimination or reflects any lack of good faith in the hiring process by any of the persons who made the decision to select Wilson over Plaintiff for the 2017 Vacancy. *See Byrnie*, 243 F.3d at 104 (holding that the failure to screen out application based on its being incomplete and the applicant was not lacking the appropriate qualifications

Plaintiff does not challenge their clarity or specificity.  With respect to the 2017 Vacancy, each candidate was asked the same set of questions.  Joint Statement ¶ 19.  At the beginning of the interview, each applicant was told that they would be asked the same exact questions and they should do their best to answer to the best of their ability.  *Id.* ¶ 20.  At the conclusion of the interview, each applicant was given the opportunity to provide additional information based on the ten or eleven questions asked.  *Id.*  During the interview, Wilson simply showed that she had more of the qualities that the job required than the other applicants did.  In Josephson's view, Wilson conveyed superior skills with data management and computer systems able to handle large data sets and the ability to interact and coordinate with large number of groups that Plaintiff.   By contrast, Plaintiff did not provide information regarding her data management or mathematical modelling abilities.  Def. Statement ¶ 9.  In Mannino's view, "Wilson more effectively explained to the interview panel how she would apply her skillset to the job."  *Id.* ¶ 11.  Wilson showed an appreciation for the complexity of the example provided and an ability to work through difficult issues to move a project forward, highlighted as a great number of written documents she had prepared, and demonstrated an ability to involve colleagues in making decisions.  *Id.*  Carpenter believed Wilson generally "provided detailed answers," "showed a thorough understanding of the questions and provided relevant responses," and "was able to show how her experiences could weave together for project management purposes."  *Id.* ¶ 12.

---

was not enough to call into question the good faith of the hiring process).  The determination that Wilson was qualified was made by RTP without the involvement of any of the members of the panel interviewing the candidates for the 2017 Vacancy.  The panel members simply accepted RTP's determination of the eligibility for an interview of each of the candidates on the 2017 certificate.  Joint Statement ¶¶ 15, 18–19; Def. Statement ¶¶ 3–4.  In any event, it is undisputed that by the time of the 2018 Vacancy, Wilson qualified for the promotion.

Plaintiff's primary argument is that she was more qualified than Wilson and that any reasonable and logical interview panel would have understood that and would have understood that Wilson overstated her experience.  She asserts that Defendant's reasons for selecting Wilson had to be pretextual because "even minimal inquiry into Wilson's interview answers and application details would have put the interviewers on notice that Wilson embellished her experience," and "[i]t defies logic and reason that the interviewers' sole function was to uncritically write down the answers and accept them without judgment."  Dkt. No. 57 at 13.  She complains that "the hiring panel members did not confirm the accuracy of Wilson's interview answers or application and there is good reason to question her veracity."  *Id.*[8]  Specifically, Plaintiff makes four assertions of fact: (1) she was more qualified than Wilson based on education because she not only has a bachelor's degree but also two master's degrees and a Ph.D., Dkt. No. 58 ¶ 30; (2) she has worked for EPA since 1989, while Wilson had been with EPA for only two years at the time of the 2017 Vacancy, *id.* ¶ 31; (3) her experience includes work as an Environmental Scientist and Physical Scientist, Superfund site cleanup and working for state agencies, the U.S. Navy, and EQB in Puerto Rico, *id.*; and (4) she earned four Bronze Medals for Outstanding EPA work performance in 1994, 1995, 1997, and 2011, *id.* ¶ 32.

Those assertions, however, are insufficient to give rise to a genuine issue of fact regarding the honesty of the 2017 Vacancy interviewers and their judgment that Wilson was better suited for the RPM position.  By the time, the list of candidates reached the interview panel, RTP had already determined that each of them satisfied EPA's basic requirements for the job, including with respect to educational qualifications.  Those requirements were minimal:

---

[8] There is no evidence, and Plaintiff does not claim, that Defendant "disregard[ed] or misjudge[ed] . . . plaintiff's job qualifications."  *Byrnie*, 243 F.3d at 103; *see also* Dkt. No. 58 ¶ 15 (Josephson stating that Plaintiff was qualified).

Employment in a position at GS-13 level or eligible to be promoted to GS-13 level, or a sufficiently high score on the application to qualify for the competitive certificate; one year of specialized experience related to the position, including paid and unpaid experience;[9] and a bachelor's degree from an accredited or pre-accredited college or university in one of several areas.  Dkt. No. 52-1 at 2.  There is no question that Wilson satisfied the last two of those requirements and with respect to the first, the panel was told that she had satisfied that as well.  The 2017 Vacancy posting does not list length of tenure at EPA, or number of degrees or awards, or number of positions held as criteria based upon which the panel would be judging the applicants.  Rather, the posting indicates that the panel is looking to qualitative factors such as:

> competencies in the following areas: 1) Knowledge of guidance related to the implementation of the rules and regulations under [CERLCA] and/or the Superfund Amendments and Reauthorization Act (SARA); 2) Ability to evaluate and utilize hazardous waste site cleanup techniques and technologies; 3) Knowledge of Federal Acquisition Regulations (FAR), cost control procedures, and/or cost accounting record keeping procedures; 4) Ability to establish goals and assess progress toward their achievement; 5) Knowledge of enforcement case development involving hazardous waste site investigation and remediation, fact-finding, and/or collection and preservation of evidence; and 6) Skill in written communication.

Dkt. No. 52-1 at 2–3.

In these circumstances, the fact that Plaintiff has more degrees and has had more experience at EPA than Wilson is not sufficient to show that the decision of Josephson and the other interview panel members to offer the position to Wilson over Plaintiff and the other applicants was pretextual or discriminatory.  Length of tenure can reflect an employee who has plateaued as much as it can reflect that an employee has the requisite experience for the job, and

---

[9] The posting highlights the value of volunteer work: "Volunteer work helps build critical competencies, knowledge, and skills and can provide valuable training and experience that translates directly to paid employment.  You will receive credit for all qualifying experience, including volunteer experience."  Dkt. No. 52-1 at 3.

the number of degrees can reflect unfulfilled promise as much as it can qualification.  Unless

those are criteria against which the employer indicates it will judge an employee, it is not for the

Court or the disappointed employee to say which it is.  *See Abraham*, 398 F. App'x at 635

(stating that plaintiff's apparent "belief that the . . . position required [these qualifications] is

irrelevant; employers, not the court, determine what qualifications are necessary").  Here, EPA's

job criteria left it to the interview panel to decide, after the applicants were qualified, which of

the four was the best for the job.  The panel's judgment cannot be found to be discriminatory

merely because it determined that, notwithstanding Plaintiff's greater relative seniority,

Wilson—and not Plaintiff—was the better one for the job.  *Boyer v. Riverhead Cent. Sch. Dist.*,

2008 WL 11412042, at *8–9 (E.D.N.Y. Sept. 11, 2008), *report and recommendation adopted in*

*part, rejected in part*, 2008 WL 11412043 (E.D.N.Y. Sept. 29, 2008), *aff'd*, 343 F. App'x 740

(2d Cir. 2009); *see also Simmons v. City of New York*, 2017 WL 6397745, at 12 (S.D.N.Y. Dec.

13, 2017) ("Courts 'afford employers a great deal of discretion in assessing the credentials and

qualifications of applicants.'" (quoting *Milano v. Astrue*, 2008 WL 4410131, at *32 (S.D.N.Y.

Sept. 26, 2008))).

 Moreover, the record does not contain evidence from which a reasonable jury could find

that Plaintiff's credentials were "so superior to the credentials of the person selected for the job

that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate

selected over the [plaintiff] for the job in question."  *Abraham*, 398 F. App'x at 635 (quoting

*Byrnie*, 243 F.3d at 103).  Although Plaintiff's educational credentials are impressive, Wilson's

educational credentials are also impressive.  Plaintiff has a degree in Chemistry and Biology;

Wilson graduated *summa cum laude* from the College of William and Mary[10] with a degree in

---

[10] Defendant's reply memorandum states that Wilson graduated *summa cum laude* from the

Biology after receiving a certificate in spatial analysis from the University of Pennsylvania.  Dkt. No. 52-5 at 13-14. Although Plaintiff has a list of accomplishments over a long period of time, Wilson also has a lengthy list of accomplishments over a short period of time.  Dkt. No. 52-4.  It includes: presenting research on a population analysis and co-writing a peer reviewed paper that resulted in the adoption of legislation in the Commonwealth of Virginia even before she graduated from college; conducting a population analysis and presenting findings at a research symposium while working at Oregon State University; receiving an award for her research on climate change while an undergraduate researcher at the College of William and Mary and an impressive list of jobs and internships after she graduated from college and before joining EPA, including work that required complex and multi-disciplinary planning efforts with public and private groups and state, local, and federal agencies and work where she received feedback that she was one of the best research associates that her supervisor had worked with and was a team player.  *Id.*  At EPA, Wilson had worked as a Life Scientist and had received a monetary award for some of her work, the 2015 Award for Regional Best Practices from EPA's headquarters, a Bronze Medal for Commendable Services from Region 2 in 2017, and an "Outstanding" performance rating for fiscal year 2017 as well as the 2017 "Best Practices Award for Creative and Innovative Practices in Enforcement and Compliance Assurance Program" from EPA's headquarters.  Dkt. No. 57-5 at 9–10.  Her application reflects extensive work with respect to data analysis.  *Id.*  The point is not whether Wilson is a superior candidate to Plaintiff; the question is whether, on this record, a reasonable jury could find that Plaintiff was superior to Wilson.  *Abraham*, 398 F. App'x at 635.  And on this record, no reasonable jury could find that

---

University of Pennsylvania, Dkt. No. 61 at 9, but her resume reflects that, while she obtained credits from the University of Pennsylvania, Wilson's undergraduate degree is from College of William and Mary, Dkt. No. 52-4 at 7–8.

Plaintiff is clearly superior to Wilson.  "To fault the Government for selecting [Wilson] over [Plaintiff] would improperly require the factfinder to 'act as a super personnel department, second-guessing the merits of' the Government's decision."  *Sattar v. Johnson*, 129 F. Supp. 3d 123, 140 (S.D.N.Y. 2015) (internal quotation marks and citations omitted) (quoting *Witkowich v. Gonazales*, 541 F. Supp. 2d 572, 582 (S.D.N.Y. 2008)), *aff'd sub nom. Sattar v. United States Dep't of Homeland Sec.*, 669 F. App'x 1 (2d Cir. 2016).

Plaintiff responds that "even minimal inquiry into Wilson's interview answers and application details would have put the interviewers on notice that Wilson embellished her experience."  Dkt. No. 57 at 13.  For that proposition, Plaintiff cites to her own declaration in which she asserts, for example, that (1) Wilson could not have had experience with all of the environmental regulations listed on her application because, in her interview, she did not refer to or list enforcement cases on which she worked or "cases of inspections done on RCRA," Dkt. No. 58 ¶ 38; (2) Wilson was untruthful about the duties of her job because she "was never in charge of doing GIS mapping" and "was never assigned to do RCRA enforcement action as those duties are assigned to another section" to which Wilson was not assigned, *id.* ¶ 39; (3) "[b]ased on the position she held in her few years working for the EPA . . . she never worked with CECLA [sic] regulations as she claimed," *id.* ¶ 41; and (4) "Wilson misrepresented that she supervised a professional team; rather she just co-wrote review with peers (which is regular college undergrad student work)," *id.* ¶ 42.

The assertion that Wilson lied on her application, however, does not support Plaintiff's claim for employment discrimination for two independent reasons.  First, even if Wilson had lied on her application, there is no evidence that any of the panel members or anyone who was involved in the selection of Wilson was aware of any inaccuracies.  An employer cannot be

liable for employment discrimination for favoring one employee over another when it is told that

the first employee is superior to the other.  *Cf. Medeiros v. Pratt & Whitney Power Sys., Inc.*, 272

F. App'x 78, 79 (2d Cir. 2008) (summary order) ("[A] subjective evaluation, without more,

cannot permit a finding of pretext, as long as the results of such an evaluation—and thus the

reasons asserted for the adverse employment action—are 'clear, . . . specific, and honest.'"

(alterations adopted) (quoting *Byrnie*, 243 F.3d at 104–05)); *Moy v. Perez*, 2016 WL 5239611, at

*5 (S.D.N.Y. Sept. 21, 2016) (concluding that disparity in qualifications alone was insufficient to

survive summary judgment even where the application of the candidate who was promoted over

the plaintiff were contended to contain falsehoods).  Second, and more importantly, there is no

evidence to support Plaintiff's allegations.  While Plaintiff complains that Wilson could not have

had experience with the environmental regulations she listed because she does not refer to

enforcement cases she handled, Wilson did not claim to have handled enforcement cases.  Nor is

that listed as one of the criteria on which applicants would be judged.  She stated that she

planned, organized, developed the schedule for, and implemented the Next Generation program

to improve compliance with those environmental regulations.  Dkt. No. 52-5 at 9–10.[11]  Wilson

did not claim to be in charge of GIS mapping or to have been assigned to RCRA enforcement

actions.  She stated that she used ArcGIS to analyze spatial data to make recommendations of

locations for inspection, including to RCRA inspectors and management.  She did not claim that

she supervised a professional team while in college; she stated that she was the "second author"

on the paper.  She claimed to have knowledge of CERCLA; Plaintiff offers no evidence to refute

---

[11] Wilson stated that, as a member of the Data Management Team tasked with targeting facilities for inspections, she "used data and data analysis to target facilities for inspection which allowed [the Division of Enforcement and Compliance Assistance] to increase compliance with federal regulations."  Dkt. No. 52-5 at 10.

that.  To be entitled to a trial, the non-moving party must do more than level accusations.  She must support them with "admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo*, 536 F.3d at 145.

There is no other evidence that would support an inference of pretext.  The evidence is undisputed for summary judgment that there were no discussions of Plaintiff's perceived heritage during the meeting that resulted in Wilson's selection over the other three candidates and that Plaintiff's national origin did not affect the panel members' decision not to select Plaintiff as the successful candidate.  Def. Statement ¶ 14.  There also is not evidence that Plaintiff was told or heard anything that suggested that Josephson or O'Connell had a negative perception of Plaintiff because of her national heritage or that her heritage played any role in the promotional process.  *See* Joint Statement ¶ 33 ("O'Connell did not say anything to Garcia that led her to believe that her non-selection for the 2018 Vacancy was due to discrimination based on her status as a Hispanic person."); *id.* ¶ 34 ("Josephson did not say anything to Garcia that led her to believe that her non-selection for the 2018 Vacancy was due to discrimination based on her status as a Hispanic person."); *id.* ¶ 35 ("O'Connell never asserted anything in writing that led Garcia to believe that her non-selection for the 2018 Vacancy was due to discrimination based on her status as a Hispanic person, aside from the fact that O'Connell did not return Garcia's phone calls or emails after Garcia was not selected for the 2018 Vacancy."); *id.* ¶ 36 ("Josephson never asserted anything in writing that led Garcia to believe that her non-selection for the 2018 Vacancy was due to discrimination based on her status as a Hispanic person."); *id.* ¶ 37 ("Josephson never made negative comments to Garcia about her status as a Hispanic person."); *id.* ¶ 38 ("Garcia was not told that Josephson said anything negative about her in connection with

her status as a Hispanic person."); *id.* ¶ 39 ("Garcia was not told that O'Connell said anything negative about her in connection with her status as a Hispanic person.").

Plaintiff argues that there is enough evidence for a jury to infer discrimination and pretext because Josephson's staff is 85% white and of the six RPM positions he has, five have been consistently held by white people, one has been held by a person who is African-American, and none have been held by persons of Hispanic heritage.  Dkt. No. 57 at 2-3 (citing Ex. 3).  But, without more, those statistics mean nothing.  It "amounts to nothing more than raw numbers which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination."  *Lomotey v. Connecticut-Dep't of Transp.*, 355 F. App'x 478, 481 (2d Cir. 2009) (summary order).  Plaintiff does not identify whether those persons were appointed by Josephson or just inherited by him, when they were hired, what the applicant pool was like, or what the relevant qualifications were of the different employees.  That the occupants of any position may be predominantly of one race or nationality may be regrettable; it is not enough to label the supervisor a bigot or a discriminator.

Plaintiff's argument based on statistics with respect to promotions suffers from a similar flaw.  She cites a 2017 EPA report stating that "[i]nternal applications for promotion to senior-level GS-13 and GS-14 positions, were received at rates significantly lower than the relevant applicant pool for both Hispanic Males and Females."  Dkt. No. 57 at 8.  But the fact that there are fewer persons of Hispanic national origin who apply for a particular position does not speak at all to the question whether when such a person does apply and does not receive the position, the decision should be understood to be the product of discrimination or, rather result from legitimate non-discriminatory reasons.  Nor does it speak to whether, in Plaintiff's situation, the reasons that were given by the panel for selection Wilson over her and the others were the real

reasons (as the panel members assert) or pretextual ones.  Indeed, the report cites no data specific to the office to which Plaintiff applied and thus provides no probative evidence regarding a pattern or practice of discrimination or pretext.  *Coser v. Moore*, 739 F.2d 746, 752–53 (2d Cir. 1984).

Plaintiff further argues that an inference of pretext arises on the theory that Josephson was untruthful in his EEO responses.  Evidence that an employer has lied in an EEO response can reflect consciousness of wrongdoing and thus support an inference of discrimination and pretext.  *See Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 133 (2d Cir. 1987) (affirming district court finding that justification for employment action was a pretext where original explanation offered to New York State Division of Human Rights "was clearly false" and justification changed over time).  In this case, however, there is no evidence that Josephson lied in his response to the EEO or took any other actions that would reflect consciousness of wrongdoing. The EEO Investigative Affidavit asks: "Are you aware of Complainant's national origin? If yes, what do you perceive it to be?"  Dkt. No. 57-12 at 2.  Josephson answered: "No – I am not aware of the Complainant's national origin."  *Id.*  There is no evidence that the answer was untruthful. The immediately preceding question asked for Josephson's national origin and Josephson answered: "United States."  *Id.*  A later question asked for the national origin of the other applicants, and Josephson stated that he did not know their national origin.  *Id.* at 4–5.  The answers read in their entirety are thus corroborative of Josephson testimony at his deposition that he was not aware how Plaintiff self-disclosed her national origin or heritage, Dkt. No. 52-8 at 53, and of his assertion in a reply affidavit in further support of the motion for summary judgment, that he understood the question to be asking about Plaintiff's country of origin, which he did not know, Dkt. No. 63-3 ¶ 3.  That conclusion does not change because in an earlier answer to the

EEO Investigative Affidavit, Josephson disclosed that he knew Plaintiff from their service together on the EPA Region 2 Diversity Workgroup where Plaintiff was an official member and he was a coordinator/facilitator, or because he admitted in deposition that he knew Plaintiff spoke with a Spanish accent.  *See* Dkt. No. 57-12 at 2; Dkt. No. 52-8 at 53.  There is no evidence that Plaintiff identified herself or was identified by others as being of a particular national origin in connection with the working group or that Josephson knew where Plaintiff was from simply because he knew she spoke with "a Spanish language accent."  Dkt. No. 52-8 at 53.

Next, Plaintiff contends that Josephson ignored the EPA's Merit Promotion Program ("MPP").  Dkt. No. 57 at 6.  She argues that the MPP requirements were violated when, with respect to the 2017 Vacancy, Josephson acted as both selecting official and subject matter expert because this constituted "a conflict of interest under the program."  *Id.* at 7.  She also argues that the MPP requirements were violated when the hiring panel did not discuss the affirmative action goals of the agency in purported violation of the program requirements that "[e]ach selecting official should choose the person(s) who will best fulfill their needs and the objectives of the organization, taking into consideration the Agency's affirmative action goals."  Dkt. No. 57 at 19 (quoting Dkt. No. 57-15 at 16).  She further contends that "the candidates were not 'referred alphabetically on a certificate to selecting official as best qualified candidates.'"  *Id.* (quoting Dkt. No. 57-15 at 15).

The cited pages, however, do not support Plaintiff's accusation.  They state that "[a]pplications may be evaluated by a subject matter expert, a rating panel or a personnel specialist," Dkt. No. 57-15 at 14, for referral to the selecting official, but they do not state that the subject matter expert may not also be the selecting official.  The MPP manual also does not state that the panel is required to consider explicitly race or national origin.  To the contrary, the

manual states that it is the objective of the EPA "that all competitive selections . . . are based solely on merit and job-related criteria, and without regard to such factors as candidates' race, color, sex, religious, political or labor organization affiliation, marital status, national origin, age or handicapping condition." Dkt. No. 57-15 at 6.[12]  While the manual does permit all "best-qualified" candidates to be referred without a ranking or scoring (and thus supports the method Defendant used for the 2017 Vacancy) and states that best qualified candidates should be referred to the selecting official in alphabetical order, Dkt. No. 57-15 at 15, that was in fact what was done.  *See* Dkt. Nos. 52-9, 52-16; *see also Turner v. NYU Hosps. Ctr.*, 470 F. App'x 20, 24 – 25 (2d Cir. 2012) (summary order) (plaintiff's argument that defendant violated its own internal procedures was belied by the record).

Finally, Plaintiff argues that a jury could infer a discriminatory motive by an EEO Investigative Affidavit of one of the interviewers for the 2017 Vacancy, Carpenter, that conveys that Wilson was selected because she was able to "articulate" her experience, and Plaintiff asserts the use of this term was "seemingly code for her Hispanic accented speech." Dkt. No. 57 at 17; *see also* Dkt. No. 63-4 at 4.  The argument is absurd.  When asked why she favored the selected candidate, Wilson, over the three other candidates, Carpenter responded: "All candidates were asked the exact same interview questions.  The selected candidate provided more in-depth responses, appeared better prepared for the interview in terms of her responses to the questions and was able to articulate how her experiences would support her in the remedial project manager position, if selected." Dkt. No. 63-4 at 4.  Carpenter also stated that she did not know

---

[12] Indeed, federal law requires "selection and advancement [decisions to] be determined solely on the basis of relative ability, knowledge, and skills, and fair and open competition which assures that all receive equal opportunity." 5 U.S.C. § 2301(b)(1); *see also* Dkt. No. 63-1 ¶ 4 ("EPA hiring managers do not take into account factors such as gender, race, ethnicity, and national origin when making hiring or promotion decisions.").

the national origin of any of the candidates at the time of the decision and only learned after the

fact that Plaintiff self-identified as Latina but that her specific national origin was still unknown.

*Id.* at 2.  There is no suggestion whatsoever that Carpenter was biased or that her decision to

select Wilson for the promotion was motived at all by Plaintiff's accent or her national origin.[13]

## II.     Plaintiff's Claims for Retaliation

Plaintiff also alleges that the decision not to promote her was in retaliation for her

protected activity under Title VII.  Specifically, she claims she made multiple EEO claims and

participated in a May 2016 MSPB proceeding where she testified against EPA, that EPA was

aware of such protected activity, and that there is a causal connection between that protected

activity and the failure to promote her.  Dkt. No. 2 ¶¶ 65–68.  Defendant moves for summary

judgment on that claim.

Under Title VII, it is unlawful for an employer to discriminate against an employee

because that employee "has opposed any practice made an unlawful employment practice by this

subchapter, or because he has made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  Title

VII thus is violated when "a retaliatory motive plays a part in adverse employment actions

---

[13] Plaintiff relies on the Seventh Circuit's decision in *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995), in which the court relied in part on an evaluation of the relative merits of the candidates in determining that a jury question had been presented regarding pretext, but that case did not apply the Second Circuit test for pretext when promotion decisions are based on subjective factors, and it has never been followed—or indeed, cited—by any court in the Second Circuit.  As the Seventh Circuit has since emphasized, *Perdomo* involved additional evidence of discrimination.  *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1178 n.1 (7th Cir. 2002).  The Court finds persuasive the explanation of *Perdomo* in *Bell v. U.S. E.P.A.*, 1999 WL 965710, at *5–6 (N.D. Ill. Oct. 15, 1999).  The court there explained that *Perdomo* involved a "patently arbitrary selection process" in which the person responsible for the promotion "simply took recommendations from his underlings and performed the analysis of whom should receive the promotions 'in his head'" and distinguished the facts of that case from one in which there was "a detailed application procedure, interviewing sessions, and meetings where the selecting officials attempted to reach a unanimous decision."  *Id.*

toward an employee, whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993).  To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he participated in a protected activity; (2) participation in the protected activity was known to the employer; (3) the employer thereafter subjected him to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).[14] The burden of proof at the *prima facie* stage is "de minimis," *Hicks*, 593 F.3d at 164, and as with claims of discrimination, "[w]here a plaintiff has made allegations of discriminatory retaliation, courts must use 'an extra measure of caution' in determining whether to grant summary judgment 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence,'" *Avillan*, 2015 WL 728169, at *6 (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006)).

As with claims of discrimination, where a *prima facie* showing of retaliation has been made, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  If the defendant proffers such a reason, "the presumption raised by the *prima facie* case is rebutted and drops from the case." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (internal quotation marks omitted).  The plaintiff then bears the ultimate burden to show that the employer's proffered reason was merely a "pretext for an unlawful motive." *Craine v. Trinity Coll.*, 791 A.2d 518, 535 (Conn. 2002); *see Gorzynski*, 596 F.3d 93, 107 (2d Cir. 2010).  "A

---

[14] The Court assumes, based on the broad language of Title VII that personnel actions by federal employers "shall be made free from any discrimination," that Plaintiff need only establish that retaliation was a motivating factor and not the but-for cause of her non-selection.  *See Babb v. Wilkie*, 140 S. Ct. 1168, 1173 (2020).

plaintiff may carry this burden by reference to the same evidence used to establish a *prima facie* case, provided that the evidence admits plausible inferences of pretext." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88–89 (2d Cir. 2019).

Defendant assumes that Plaintiff has established a prima facie case of retaliation. It argues that it has established a legitimate, non-discriminatory and non-retaliatory reason for Plaintiff's non-promotion and that Plaintiff cannot establish pretext.

The burden is on Plaintiff to identify some evidence to show that Defendant's asserted reasons for her non-promotion were not the real ones. Plaintiff argues that retaliation may be inferred because "Defendant's conduct . . . follows on [Plaintiff's] relatively recent (2016) reinstatement to EPA employment" by the MSPB. Dkt. No. 57 at 21. The Second Circuit has held, however, that while "the temporal proximity between [protected activity] and [an adverse employment actions]" can satisfy a plaintiff's *prima facie* burden, "[i]t cannot demonstrate pretext." *Bentley*, 935 F.3d at 90. Moreover, even if it were relevant to pretext, the length of time between the MSPB proceeding—by which Plaintiff was reinstated in April 2016—and the 2017 Vacancy decision over a year later, as well as the 2018 Vacancy decision over two years later is too long to give rise to any inference of causation and thus to rebut Defendant's assertion of a legitimate non-discriminatory and non-retaliatory reason for its actions. *See Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 104–05 (2d Cir. 2020); *Cortes v. MTA New York City Transit*, 802 F.3d 226, 233 (2d Cir. 2015).

There is no other evidence of retaliation. At the time Plaintiff was not selected for the 2017 Vacancy or the 2018 Vacancy, Josephson had no knowledge of any of the discrimination or retaliation complaints that Plaintiff had filed at EPA. Def. Statement ¶¶ 25–26.[15] At the time

---

[15] In her Rule 56.1 counterstatement, Plaintiff states that "Josephson's denial of awareness of

Plaintiff was not selected for the 2018 Vacancy, O'Connell had no knowledge of any discrimination or relation complaints that Plaintiff had filed at EPA.  *Id.* ¶ 27.  There is thus no reason to assume that their decisions with respect to either vacancy were pretexts for retaliation.

Plaintiff tries to create a fact issue by arguing that her reinstatement by MSFB was "a very big deal within EPA Region #2," "the gossip mill assured that everyone knew about it," and her return was "big news" and that therefore Josephson and O'Connell must have known about it and must have retaliated against her on the basis of it.  Dkt. No. 57 at 21–22; *see also* Dkt. No. 58 ¶ 4 ("In colloquial terms, everyone knew about my reinstatement and it had to be embarrassing to EPA Region #2."); *id.* ¶ 59.  She also asserts that there was a supervisory meeting in May 2016 in which her supervisors discussed where Garcia would work once she was reinstated.  Dkt. No. 57 at 22.

That Josephson or O'Connell were aware of Plaintiff's return (and thus presumably of her earlier departure), even if it were supported by fact, would not support an inference that their decisions in connection with the 2017 Vacancy and 2018 Vacancy were a pretext for Plaintiff's protected activity.  Plaintiff's employment had been terminated based on EPA's finding that Plaintiff had engaged in inappropriate conduct.  She allegedly made crude and unprofessional comments to her co-workers about their profile photographs.  Def. Statement ¶ 20.  Plaintiff appealed to the MSPB on the grounds that the decision was not supported by the evidence and on the grounds that she was the victim of national-origin discrimination; the MSPB accepted the first argument and rejected the second.  Dkt. No. 52-22.  Assuming Josephson or Connell knew

Garcia's MSPB order of reinstatement is challenged" and "Josephson's denial of awareness of Garcia's EEO activities is challenged."  Dkt. No. 60 ¶¶ 24–26.  Plaintiff does not cite to any evidence in support of her position, and, for the reasons set forth *infra*, the evidence does not support it.

of Plaintiff's departure and knew of her return, that knowledge thus would not necessarily

translate into knowledge that Plaintiff engaged in any protected activity.

Moreover, Plaintiff's accusation is not supported by any admissible evidence of fact.  "A

party may not rely on mere speculation or conjecture as to the true nature of the facts to

overcome a motion for summary judgment."  *Hicks*, 593 F.3d at 166 (alteration adopted)

(quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)); *see also Jaramillo*, 536 F.3d

at 145 (explaining that "the nonmoving party must come forward with admissible evidence

sufficient to raise a genuine issue of fact for trial" to defeat summary judgment).  Her assertion

that there was a meeting in May 2016 about her employment is based on her deposition

testimony that she was informed of such a meeting by an EPA employee named Tracy Truesdale

who was informed of it from an EPA employee named Terry Bourbon who, in turn, allegedly

heard about such a meeting from her husband John Bourbon, who was a section chief at EPA and

allegedly attended such a meeting.  Joint Statement ¶ 51.  Aside from the multiple levels of

hearsay which alone are sufficient to deprive this testimony of any significance, Bourbon has

sworn that no such meeting took place.  Def. Statement ¶ 21.

Plaintiff also asserts that Josephson and O'Connell must have known about her

termination and her return are based on her claim that during the period after she had been fired,

and before she was reinstated, the EPA distributed and posted a flyer at the entrance to the

building barring her reentry and that when Plaintiff was reinstated, her union conveyed that

information to its members.  Dkt. No. 58 ¶¶ 56–58.  However, the flyer to which she cites is a

memorandum directed to the Federal Protection Services and the Edison Guard Force Contracts,

and not to all employees.  Dkt. No. 57-18.  The flyer contains a direction requiring that it

"information in this special order is personal in nature and shall not be shown or discussed with

anybody other than security personnel." *Id.* Both Josephson and O'Connell declare that, until its inclusion in Plaintiff's opposition to the motion for summary judgment, they had never seen or heard about the flyer and that they were last union members decades before they became EPA supervisors and never received, directly or indirectly, any information published by the union about Plaintiff's reinstatement. Dkt. No. 63-3 ¶¶ 5–6; Dkt. No. 63-6 ¶¶ 4–5.

Plaintiff has not adduced any evidence that would rebut Defendant's legitimate non-discriminatory and non-retaliatory reason not to promote her. Defendant is therefore entitled to summary judgment on Plaintiff's retaliation claim.[16]

## CONCLUSION

The motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 49 and to close the case.


SO ORDERED.

Dated: March 28, 2022
New York, New York
_____
LEWIS J. LIMAN
United States District Judge

---

[16] Plaintiff asserts rights under 42 U.S.C. § 1981a, which addresses the relief available in an action against a respondent who engages in unlawful intentional discrimination, but which is not addressed by 42 U.S.C. § 1981. That statute does not permit the recovery of punitive damages against a governmental agency, 42 U.S.C. § 1981a(b)(1), or the recovery of backpay, interest on backpay, or relief that is authorized under the relief provisions of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(g), *id.* § 1981a(b)(3). Since the Court grants summary judgment for Defendant on Plaintiff's substantive claims for discriminatory non-promotion and retaliatory non-promotion it need not further address this statute.